**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. ______________

FNY PARTNERS FUND LP and FNY MANAGED ACCOUNTS, LLC, *individually and on behalf of all others similarly situated,*

*Plaintiffs,*

*v.*

DOUGLAS K. AMMERMAN, WILLIAM P. FOLEY II, THOMAS M. HAGERTY, ANTHONY M. JABBOUR, DUN & BRADSTREET HOLDINGS, INC., and CANNAE HOLDINGS, INC.,

*Defendants*.
____________________________________/

**CLASS ACTION**

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiffs FNY Partners Fund LP and FNY Managed Accounts, LLC (collectively, "Plaintiffs"), by and through their attorneys, bring this Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint") on behalf of themselves and all other similarly situated sellers of Dun & Bradstreet Holdings, Inc. ("D&B" or "Dun & Bradstreet" or the "Company") common stock. Except for allegations specifically pertaining to Plaintiffs, the allegations in the Complaint are based upon information and belief, which includes but is not limited to: (a) Dun & Bradstreet's public filings with the United States Securities and Exchange Commission (the "SEC"); (b) other publicly available data; and (c) the investigation by counsel.

**NATURE OF THE ACTION**

1. This is a federal securities class action brought under Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78n(a), and 78t(a), and Rules 10b-5 and 14a-9 promulgated thereunder, 17 C.F.R. §§ 240.10b-5 and

240.14a-9, on behalf of a class of former stockholders of Dun & Bradstreet Holdings, Inc. ("Dun & Bradstreet," "D&B" or the "Company") that: (1) sold shares of D&B common stock in the open market during the period from May 13, 2025 through August 26, 2025, inclusive (the "Class Period"); (2) exchanged shares of D&B common stock into the Merger (defined below); and/or (3) held shares of D&B common stock as of the May 9, 2025 record date ("Record Date") for the special meeting of stockholders and whose shares were voted on, or entitled to vote on, the Merger (defined below) (subject to certain exclusions, the "Class").

2. On or about March 23, 2025, D&B agreed to be acquired by affiliates of Clearlake Capital Group, L.P. ("Clearlake") for $9.15 per share in cash (the "Merger"). To obtain the stockholder approval required to consummate the Merger, D&B issued a definitive proxy statement on Schedule 14A on May 13, 2025 (the "Proxy"). D&B stockholders voted to approve the Merger on June 12, 2025, and the Merger closed on August 26, 2025.

3. The Proxy painted a false and misleading picture to advance the personal interests of the Company's Executive Chairman, William P. Foley II ("Foley"). It portrayed the Merger as the product of an ordinary-course strategic review and organic, arm's-length interest in the Company. In truth, the sale was engineered by Foley to relieve an acute liquidity crisis at Cannae Holdings, Inc. ("Cannae")—D&B's largest stockholder, which Foley also chaired—and to defeat an activist proxy contest that threatened Foley's control of Cannae.

4. Foley was hopelessly conflicted. Cannae, which had invested more in D&B than in any other holding and owned approximately 13.5% of the Company, traded at a discount of nearly 40% to its net asset value and had come under intense pressure from activist investors to monetize its public holdings and return capital. Those Cannae investors included Saba Capital and Carronade Capital Management ("Carronade"), which had nominated a dissident slate to Cannae's

board. A fast, whole-company cash sale of D&B was Foley's most expedient means of raising that cash and blunting Carronade in advance of Cannae's 2025 annual meeting. The interests of Cannae and Foley in a quick sale at any price diverged sharply from the interests of D&B's public stockholders in obtaining fair value for their shares. Yet, the Proxy contained false and misleading statements designed to conceal this true motive for the Merger.

5. More importantly, the $9.15 per share Merger price was a fire sale. It was 24% below the $12.00 per share that Clearlake itself had offered in November 2024, and 33% below the $12.13 per share analyst consensus price target that prevailed until news of the deal leaked. Research analysts publicly condemned the price as "unreasonably low" and "baffling," derided portions of the fairness analysis of the Company's financial advisor, Bank of America Securities ("Bank of America"), as "laughable" and attributed the outcome to Foley's conflicts of interest.

6. To secure stockholder approval, Defendants disseminated a Proxy that was materially false and misleading, and that omitted material facts necessary to make the statements therein not misleading, in at least four respects.

7. ***First***, the Proxy concealed the true genesis of the sale. It represented that the Company "regularly reviews and assesses" its strategic direction and that the process arose from "periodic inbound inquiries" and an "informal market check," while never once disclosing Carronade, the activist campaign against Cannae by Carronade and others, the pendency of the Cannae proxy contest or Foley's activist-driven liquidity crisis and subsequent plan to sell D&B to return capital to Cannae and its stockholders. These omissions falsely suggested that the activist pressure on Cannae played no role in the sales process and the resulting Merger.

8. ***Second***, the Proxy omitted Bank of America's own valuations of superior alternatives to a whole-company sale. The Proxy disclosed a single, value-destructive alternative

—a spin-off D&B's international business segment valued at $6.55 to $9.06 per share—while omitting that, less than two weeks before signing, Bank of America had valued other alternatives well above the Merger price, including a Reverse Morris Trust at $11.35 per share (24% above the deal price), a tax-free separation at a midpoint of $11.26 per share (23% above), and a "RemainCo" following a segment sale at a midpoint of $10.28 per share (12.3% above). Having disclosed one alternative, Defendants were obligated to present a complete and non-misleading picture; they did not.

9. ***Third***, the Proxy falsely stated that D&B's Board of Directors reviewed and approved the downward revisions to the Company's financial projections on which Bank of America's fairness opinion depended. The Proxy represented that the "March Projections . . . were approved by the Board." In fact, no Board meeting occurred between March 19, 2025—when management abruptly slashed the projections—and March 23, 2025, when the Board approved the Merger; the materials, agenda, and minutes for the March 23 meeting do not reference the projections at all; and the file containing the revised projections was last modified at 8:49 p.m. on March 19, 2025. The Proxy further obscured the timing of the cuts, stating only that projections were updated "in March 2025," as opposed to March 19, 2025, a mere ***four days*** before the Board approved the Merger Agreement.

10. ***Finally***, the Proxy misleadingly characterized the independence of the financial and legal advisors to the Transaction Committee and Board. In this regard, the Proxy failed to disclose long-standing, material ties between Defendant Foley and the lead banker and attorney at Bank of America, as well as with the Company's outside legal counsel at Weil, Gotshal & Mages LLP ("Weil").

11. Defendants knew these statements were false and/or were reckless in disregarding their falsity. The Company's internal books and records demonstrate that Defendants possessed the very facts that contradicted the Proxy at the time they disseminated it. Foley's and Cannae's acute, personal financial interest in a rapid sale, and their public claims of credit for the Merger as a means of returning capital to Cannae, further evidence their intent to mislead D&B stockholders.

12. At all times, D&B common stock traded in an efficient market on the New York Stock Exchange ("NYSE") under the ticker "DNB." The Proxy's material misrepresentations and omissions concealed the Company's true value and caused D&B common stock to trade—and the Merger to be priced—at an artificially deflated level that did not reflect that true value.

13. Members of the Class were damaged as a direct result. In reliance on the integrity of the market price and on the materially misleading Proxy, they sold their D&B shares during the Class Period on the open market, and/or exchanged them in the Merger, at prices that did not reflect the Company's true value and forfeited both their statutory appraisal and litigation rights. But for Defendants' wrongdoing, Class members would not have sold at the deflated prices they received.

14. Class members who were entitled to vote on the Merger were also denied the opportunity to make an appropriately informed decision on whether to vote in favor of the Merger.

15. Defendants Dun & Bradstreet, Foley, Anthony M. Jabbour, Thomas M. Hagerty and Douglas K. Ammerman reviewed, signed and/or certified the Proxy, and possessed ultimate authority over its contents. They are liable as primary violators of Section 10(b) and Rule 10b-5, as well as Section 14(a) and Rule 14a-9. Defendants Cannae and Foley, who controlled the primary violators and the contents of the Proxy—including through Cannae's dual fiduciaries and its Voting and Support Agreement—are liable as control persons under Section 20(a).

16. Through this action, Plaintiffs seek to recover the damages the Class sustained as a result of Defendants' violations of the federal securities laws.

## JURISDICTION AND VENUE

17. The claims asserted herein arise under Sections 10(b), 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a) and 78t(a), and Rules 10b-5 and 14a-9 promulgated thereunder, 17 C.F.R. §§ 240.10b-5 and 240.14a-9.

18. This Court has subject-matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

19. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). At all relevant times, D&B maintained executive offices in Jacksonville, Florida and Sunrise, Florida. The Proxy and related communications were also disseminated within Florida and within this District.

20. In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of the national securities exchange on which D&B common stock traded.

## PARTIES

### A. Plaintiffs

21. Plaintiff FNY Partners Fund LP is a Delaware limited partnership that invests in equity securities. FNY Partners Fund LP sold shares of D&B common stock during the Class Period, as set forth in the certification filed herewith, and was damaged by Defendants' violations of the federal securities laws alleged herein. FNY Partners Fund LP also held shares of D&B common stock as of the May 9, 2025 Record Date and was entitled to vote on the Merger.

22. Plaintiff FNY Managed Accounts, LLC is a Delaware limited liability company that invests in equity securities. FNY Managed Accounts, LLC sold shares of D&B common stock during the Class Period, as set forth in the certification filed herewith, and was damaged by Defendants' violations of the federal securities laws alleged herein.

23. Non-party FNY Investment Advisers, LLC (the investment advisor to FNY Partners Fund LP and FNY Managed Accounts, LLC) has an office in North Palm Beach, Florida and an office in Aventura, Florida.

**B. Defendants**

24. Defendant Dun & Bradstreet Holdings, Inc. was, at all relevant times, a Delaware corporation with its principal executive offices in Jacksonville, Florida. D&B is a global provider of business decision data and analytics; its common stock traded on the NYSE under the symbol "DNB" until the Merger closed on August 26, 2025. D&B issued, filed and disseminated the Proxy and had ultimate authority over its contents.

25. Defendant William P. Foley II was, at all relevant times, the Executive Chairman of D&B and a member of its Board of Directors and served on the Transaction Committee formed in connection with the Merger. Foley was also the Chairman and Chief Executive Officer of Cannae. Foley reviewed, approved and authorized the dissemination of the Proxy. By virtue of his positions at both D&B and Cannae, Foley was a dual fiduciary and exercised control over the sales process and the contents of the Proxy.

26. Defendant Anthony M. Jabbour was, at all relevant times, the Chief Executive Officer of D&B and a member of its Board of Directors, and served on the Transaction Committee. Jabbour signed the Proxy and had ultimate authority over its contents.

27. Defendant Thomas M. Hagerty was, at all relevant times, a member of D&B's Board of Directors and served on the Transaction Committee. Hagerty was also a Managing Director of Thomas H. Lee Partners, L.P. Hagerty reviewed and approved the Proxy.

28. Defendant Douglas K. Ammerman was, at all relevant times, a member of D&B's Board of Directors. Ammerman was also a director of Cannae and of other entities affiliated with Foley. As a director of both D&B and Cannae, Ammerman was a dual fiduciary. Ammerman reviewed and approved the Proxy.

29. Defendant Cannae Holdings, Inc. is a diversified holding company founded by Foley, headquartered in Las Vegas, Nevada, with its common stock traded on the NYSE under the symbol "CNNE." Cannae was D&B's largest stockholder, owning approximately 13.5% of D&B's outstanding common stock at the time the Merger closed, and entered into a Voting and Support Agreement to vote its shares in favor of the Merger. Cannae acted with respect to the Merger through its dual fiduciaries, Foley and Ammerman, whose knowledge and conduct are imputed to it.

30. Defendants Foley, Jabbour, Hagerty and Ammerman are referred to collectively as the "Individual Defendants." The Individual Defendants, by reason of their positions with D&B and their authority over, and participation in, the preparation, review, approval and dissemination of the Proxy, are each liable as a "maker" of the misstatements alleged herein and/or as a control person.

31. Defendants Foley, Jabbour and Hagerty are also referred to collectively as the "Transaction Committee."

**C. Additional Relevant Non-Parties**

32. Bank of America Corporation, through its broker-dealer subsidiary BofA Securities, Inc. (together, "Bank of America"), served as financial advisor to the Company and the Board throughout the sales process and rendered the fairness opinion on which the Board relied in approving the Merger. Bank of America was not disinterested. Its engagement was steeped in longstanding relationships with Foley and his affiliated entities, and it stood to collect a substantial fee that was contingent on the Merger closing.

33. The senior banker who led Bank of America's D&B engagement, Cary Thompson, was a "longtime friend" of Foley who, by Bank of America's own account, "maintains social relationships with various other members of the Company's Board of Directors." Thompson and Foley served together on the board of Fidelity National Financial for roughly two decades, and Thompson had previously served as a director of other Foley-controlled companies, including Fidelity National Information Services and Black Knight, Inc. ("Black Knight"). Thompson had also advised Foley-affiliated vehicles on prior transactions, including the approximately $7.3 billion acquisition of Alight in 2021. Consistent with these ties, Bank of America began work on a potential D&B sale within days of Foley's February 2024 return to Cannae, and the effective date of its engagement letter was backdated to February 2024 even though the letter was not signed until roughly a year later—on the day the Merger Agreement was executed.

34. Bank of America was also being paid by both sides of the Merger and by Foley's broader empire. Members of its D&B deal team simultaneously covered Cannae, including the banker who served as Cannae's relationship manager, and Bank of America continued to pitch and provide services to Cannae and Clearlake during the D&B engagement. Over the period from March 1, 2023 through February 28, 2025, Bank of America derived aggregate revenues of

approximately $60 million from Clearlake and its affiliates and approximately $22 million from the Company, Cannae, and their affiliates—including at least $35 million from Clearlake during the November 2024 to February 2025 window when the Merger was being negotiated. Bank of America's fee for the Merger, approximately $54 million, was almost entirely contingent on the transaction closing, giving the bank a direct financial interest in delivering a fairness opinion that supported the deal.

35. Weil, Gotshal & Manges LLP served as legal advisor to the Transaction Committee and the Company in connection with the Merger. Weil also had a longstanding relationship with Foley: the firm—and the partner who led the D&B engagement, Corporate Department Chairman Michael Aiello—had for years served as principal outside counsel to Foley and to Foley-affiliated entities, including Cannae, Fidelity National Financial, Black Knight and Foley's special-purpose acquisition vehicles.

36. Clearlake Capital Group, L.P. is a private-equity firm that, through affiliated entities, acquired D&B in the Merger and returned the Company to private ownership at closing on August 26, 2025. Clearlake's cofounder met with D&B's Chief Executive Officer, Defendant Anthony Jabbour, regarding a potential transaction in November 2024, as the activist pressure on Cannae was intensifying.

37. Thomas H. Lee Partners, L.P. ("THL") is a private-equity firm that participated in the 2018 investor consortium that took D&B private and remained a significant D&B stockholder, holding approximately 5.1% of the Company's shares at the time of the Merger. THL entered into a Voting and Support Agreement committing its shares in favor of the Merger, and two THL managing directors—including Defendant Hagerty—sat on D&B's Board.

# SUBSTANTIVE ALLEGATIONS

## I. BACKGROUND OF THE COMPANY

### A. The Company and Its Two Segments

38. D&B was founded in New York City in 1841 as a network of correspondents that provided consistent credit information to help American merchants make decisions. Today, the Company operates in 195 countries and owns the world's largest database of commercial information, covering more than 550 million businesses worldwide, including 95% of the Fortune 500. At the core of its offerings is the D-U-N-S number, a unique nine-digit identifier the Company assigns to businesses worldwide and that clients use to substantiate a master client or master vendor record.

39. D&B divided its services into two distinct operating segments that conducted business both domestically and internationally: Finance & Risk and Sales & Marketing Solutions. The Company described these segments as "defense" and "offense," respectively. The two segments had distinct use cases, customer bases, and competitors; the Company reported its segment financial results separately and divided much of its sales force between the two segments. As the Company's Chief Financial Officer, Bryan Hipsher, explained on a May 15, 2024 earnings call, the sales force required different "subject matter expertise on the [S]ales and [M]arketing side versus Finance and Risk side," because "where we are now with the product set and the sophistication on the [S]ales and [M]arketing[,] it's a very different sale than it is on the Finance and Risk side of the equation."

40. The Finance & Risk segment—the "defense" side—offered credit-risk monitoring and portfolio-analysis products, including D&B Finance Analytics, D&B Direct, D&B Small Business, D&B Enterprise Risk Assessment Manager ("eRAM"), and D&B Risk Analytics, that help clients increase cash flow and profitability while mitigating credit, operational, compliance,

and other risks. Finance & Risk was the Company's largest business: in 2024, it generated approximately $1.375 billion in revenue (up from approximately $1.336 billion in 2023), representing roughly 56% of the Company's $2.381 billion in total 2024 revenue. The segment's principal competitors included Bureau van Dijk (owned by Moody's Corporation), Experian, Creditsafe and Equifax.

41. The Sales & Marketing Solutions segment—the "offense" side—offered analytics and solutions that help clients increase revenue from new and existing customers, enabling business-to-business sales and marketing professionals to accelerate sales, enhance go-to-market activity, and improve the efficiency of advertising campaigns. The Company's Sales & Marketing Solutions segment included D&B's Master Data Management business that helped create complete data records for the Company's subscribers. In its SEC filings, D&B separated its financial reporting for the Finance & Risk and Sales & Marketing Solutions segments into a "North American Segment" and an "International Segment."

42. Because the Finance & Risk and Sales & Marketing Solutions segments were operationally distinct, separately reported, and served by different sales forces and competitors, they were readily separable at the time of the Merger—a fact that, as alleged below, made a segment separation or sale a viable and value-creating alternative to a whole-company sale, and one the Company's own financial advisors at Bank of America later valued above the Merger price.

43. D&B has been publicly and privately owned in successive cycles controlled by the same investor group. In 2018, a consortium of investors led by Bilcar, LLC, Cannae, THL, CC Capital Partners ("CC Capital") and Black Knight took D&B private in a transaction valued at approximately $5.4 billion (the "2018 Take-Private"). In 2020, that same group returned D&B to

the public markets through an initial public offering priced at $22.00 per share, implying an equity valuation of approximately $9.1 billion. From the 2020 IPO until the Merger closed, D&B common stock traded on the NYSE under the symbol "DNB."

B. Foley's Control of D&B and Cannae

44. Foley is a well-known investor and entrepreneur who has controlled an interlocking web of businesses for four decades. His empire took root in 1984, when he acquired the then-struggling title-insurance firm Fidelity National Financial, Inc. ("FNF") through a leveraged buyout. Under Foley, FNF became one of the nation's largest title insurers and, through majority-owned subsidiaries, a leading provider of annuity and life insurance (F&G Annuities & Life, Inc.) and residential mortgage-servicing technology (Black Knight and ServiceLink). FNF also executed a series of transformative transactions—including its 2003 takeover of, and 2006 spin-off from, Fidelity National Information Services ("FIS")—and held equity investments in numerous entities, including J. Alexander's Holdings, Inc., Remy International, Inc., and Dayforce, Inc. (formerly Ceridian).

45. Foley created Cannae in stages and controls it to this day. In 2014, FNF created a tracking stock, Fidelity National Financial Ventures ("FNFV"), to track the performance of FNF's non-real-estate investments. In 2017, FNF renamed FNFV as "Cannae Holdings, Inc." and split it off as a separate public company. Cannae operates as a holding company with investments in a variety of operating companies, and since 2019 its operations have been managed by Trasimene Capital Management, LLC—an entity controlled by Foley—under a management-services agreement. Foley returned as Cannae's Chairman and Chief Executive Officer in February 2024 and immediately launched a strategic plan to monetize Cannae's public-company holdings, including its stake in D&B.

46. Foley likewise controlled D&B. Following the 2020 IPO, Cannae owned 18.6% of the Company's outstanding shares, Foley beneficially owned 9.6%, and Black Knight owned 13.3%—such that Foley effectively controlled at least 40% of D&B's shareholder voting power immediately after the IPO. Affiliates of THL, Foley's longtime co-investor, held an additional 25.2%. Foley's influence over D&B persisted through the signing of the Merger Agreement: at that time Cannae was D&B's largest stockholder, owning 15.6% of the outstanding shares;[1] Foley and Chinh Chu (a founder and managing partner of CC Capital) owned 2.9% and 3.5%, respectively; and, although THL had sold down most of its position, it still held 5.1% of D&B's shares, with Hagerty and a second THL managing director, Ganesh Rao, on the Board.

47. Foley's control was entrenched in the D&B boardroom. D&B's eleven-member Board was stacked with Foley loyalists. In addition to the Individual Defendants Jabbour, Hagerty, and Ammerman—each of whom had extensive ties to Foley as alleged above—other directors were conflicted by longstanding relationships with Foley and his affiliated entities:

a) **Richard Massey** served as Chief Executive Officer of Cannae from 2019 to February 2024 and as a Cannae director from 2018 to 2024. Massey also held or holds directorships and officerships at numerous Foley entities, including Alight, Foley Trasimene Acquisition Corp., Black Knight, FNF, FIS, ServiceLink, and two Austerlitz SPACs. Massey chairs FNF's compensation committee, which—in November 2024, while Merger negotiations were ongoing—granted Foley a "Special Award" of restricted stock units valued at approximately $50 million. Massey also holds a limited-partnership interest in Star Parent, L.P. and is a minority owner of Black Knight Sports, alongside Foley.

b) **Ganesh Rao** is a managing director of THL, a member of the consortium that took D&B private in 2018, and has served as a director of Dayforce and, previously, Black Knight and Optimal Blue.

[1] Cannae's stake in Dun & Bradstreet would later be reduced to 13.5% at Merger closing after its pre-closing sale of shares under the Voting and Support Agreement. Immediately after entry into the Merger Agreement, Cannae offloaded 9 million shares of D&B. The pre-closing sale of shares is further evidence of the acute liquidity crisis at Cannae that was the main driver for the Merger.

c) **James Quella** previously served as a director of F&G from 2017 to 2020.

d) **Ellen Alemany** previously served as a director of FIS from 2014 to 2024 and owns a minority interest in Black Knight Football.

e) **Chinh Chu** is the founder and managing partner of CC Capital, a member of the 2018 take-private consortium; at the time of the IPO, Chu and Foley shared joint beneficial ownership of 11.9% of D&B through a jointly controlled investment vehicle, and Chu served as Co-Chairman of F&G until its 2020 acquisition by FNF.

48. As a result, a majority of D&B's Board lacked independence from Foley, and Foley—through his positions at D&B and Cannae, his and his affiliates' substantial stockholdings, and his web of relationships with the Company's directors—dominated D&B's boardroom and controlled the sales process that produced the Merger. As alleged below, Foley used that control to steer D&B into a whole-company cash sale at an unfair price that served his and Cannae's interest in near-term liquidity, rather than the interests of D&B's public stockholders.

## II. CANNAE'S LIQUIDITY CRISIS AND THE ACTIVIST CAMPAIGN

49. Cannae is the principal vehicle through which Foley holds, manages, and ultimately monetizes his investments. A publicly traded holding company, its business is to acquire stakes in operating companies and later sell them at a profit, and it is run day-to-day by a Foley-controlled manager under a services agreement. One of the activists that later targeted Cannae captured this point in a 2025 proxy solicitation, describing Cannae as "simply the Bill Foley co-investment vehicle." At all relevant times, Cannae's single most valuable holding—by a wide margin—was its stake in D&B; its other principal investments included Alight, Dayforce, Black Knight Football, System1 and Paysafe.

50. By 2024, Cannae had become a serious problem for Foley. Its shares, which had traded above $45 in early 2021, had fallen to roughly $16 to $19—a decline of approximately 65%—and the stock persistently changed hands at a steep discount, approaching 40%, to the net

asset value of its underlying holdings. Cannae's investors grew impatient, and pressure built for Foley to close that gap by liquidating Cannae's public positions and returning cash to stockholders.

51. Foley responded by taking direct command. In February 2024, he returned as Cannae's Chairman and Chief Executive Officer and promptly adopted a strategy built around selling down Cannae's public-company holdings—D&B foremost among them—and routing the proceeds back to Cannae's stockholders. Signaling this defensive footing, Cannae that same month took a position in the activist fund JANA Partners, acquiring an interest for consideration that included two million Cannae shares locked up under a voting agreement.

52. The pressure sharpened over the following year as prominent activists accumulated Cannae stock. On August 14, 2024, Saba Capital reported a position of nearly 400,000 Cannae shares worth more than $7 million; by November 14, 2024, Saba had increased that stake to approximately 1.15 million shares worth almost $22 million. The same day, Carronade Capital Management disclosed for the first time a position of approximately $13.4 million in Cannae. In December 2024, Carronade escalated, nominating a slate of four directors for election to Cannae's board—a frontal challenge to Foley's control of Cannae—and it pressed its campaign through the winter, ultimately publishing a scathing open letter demanding change at Cannae in March 2025.

53. For Foley, a prompt, all-cash sale of D&B—Cannae's largest asset—was the most direct means of generating the liquidity he needed to placate Cannae's investors and repel Carronade before Cannae's annual meeting. That objective was not shared by D&B's public stockholders, who had no reason to want their company sold quickly and at a discount in order to bankroll Cannae's capital-return program. As the sequence set out below reflects, it was Foley's need—not D&B's—that drove the sales process and dictated its outcome.

## III. THE CONFLICTED, ACTIVIST-DRIVEN SALES PROCESS

54. D&B's sales process moved in time with the pressure on Cannae rather than any independent conclusion that a sale served D&B's stockholders. As late as the fall of 2024, D&B's own management was signaling that the Company was worth more than the market reflected. At an October 22, 2024 board meeting, following a strong third quarter, management explained that it had refrained from repurchasing D&B shares because of the "ongoing process," even though the stock had at times traded above $12.00—an implicit admission that management regarded the trading price as undervalued.

55. Rather than insulate the process from Foley's conflict, the Board entrenched it. After Saba surfaced as a Cannae investor, the Board—by written consent dated October 28, 2024—formed a three-member Transaction Committee composed of Foley himself, together with Jabbour and Hagerty. Each was compromised: Foley by his dual role atop Cannae, and Jabbour and Hagerty by their longstanding financial and professional ties to Foley. The Board never determined the Committee to be independent or disinterested, never authorized it to retain its own independent legal or financial advisors, and never empowered it to reject a transaction; the Committee's remit was confined to overseeing the "market check" and making recommendations back to the Board.

56. The process was engineered from the start to move toward a whole-company cash sale to ease Foley's liquidity crisis at Cannae. On October 30, 2024, Bank of America—the Company's financial advisor—circulated a process letter to eight prospective bidders that solicited only "the price that you are prepared to pay in cash at closing," shutting out alternative structures or forms of consideration that might have yielded more value for D&B's stockholders.

57. While the formal process ran its course, D&B's Chief Executive Officer pursued a parallel track. On November 15, 2024—one day after Saba and Carronade disclosed their enlarged

and new positions in Cannae—Jabbour traveled to Las Vegas, where Cannae is headquartered, to meet Clearlake co-founder Behdad Eghbali about a potential transaction. That meeting was never disclosed to D&B's public stockholders. Its timing is difficult to explain except as a response to the activist pressure closing in on Foley and Cannae.

58. The indications of interest that arrived on November 26, 2024 confirmed that D&B was worth considerably more than it was ultimately sold for. Clearlake and a second bidder each offered $12.00 per share in cash for the entire company, and a third bidder offered $10.29 per share—each of them above the $9.15 price the Board would ultimately accept roughly four months later.

59. The financial advisor steering the process was itself entangled with the interests driving it. In a conflicts letter delivered to the Board on November 26, 2024, Bank of America disclosed that members of its D&B deal team had worked on Cannae engagements since 2022, that one served as Cannae's relationship manager, and that the bank would continue to pitch and provide services to both Cannae and Clearlake during its D&B engagement. The letter further disclosed that the senior banker on the D&B deal, Cary Thompson, was a "longtime friend" of Foley who "maintains social relationships with various other members of the Company's Board of Directors," and that Bank of America had collected more than $25 million in fees from Clearlake since 2022.

60. Even with two $12.00 per share value indications in hand, the process did not advance toward a higher price. Rather, it moved toward a lower one—in step with the intensifying threat to Foley at Cannae. As Carronade pressed its campaign in early 2025, including a series of calls with Foley and Cannae's president between late February and mid-March, the Transaction Committee stayed with Clearlake even as Clearlake's price receded. Between March 17 and

March 20, 2025, Clearlake submitted a descending series of whole-company proposals—$8.25, then $8.50, then $8.90, then $9.00 per share.

61. On March 20, 2025: Carronade published its open letter attacking Cannae's leadership; Cannae answered publicly, pledging to return capital to its stockholders and to pare back its public-company holdings; and the Transaction Committee granted Clearlake exclusivity to negotiate its $9.00 proposal. These developments coincided with management's abrupt reduction of D&B's financial projections as discussed herein. One day later, on March 21, Clearlake raised its bid to $9.15 per share, and on March 23, 2025, the Board approved the Merger at that price and the Company entered into the Merger Agreement—24% below the $12.00 that had been available only four months earlier.

62. To secure the result, Cannae simultaneously executed a Voting and Support Agreement committing its shares in favor of the Merger, while negotiating for itself the right to sell up to ten million D&B shares before the Merger closed—thereby enabling Foley's vehicle to begin harvesting the cash it needed even ahead of closing.

## IV. BANK OF AMERICA'S SUPERIOR, NON-WHOLE-COMPANY ALTERNATIVES

63. The whole-Company cash sale that Foley favored was neither D&B's only option nor its most valuable. D&B's two segments—Finance & Risk and Sales & Marketing Solutions—were separately reported, separately staffed, and served different customers and competitors. As such, there was genuine third-party appetite for pieces of the Company rather than the whole. In January 2025, a strategic party offered to acquire D&B's Master Data Management business—a valuable subsegment of Sales & Marketing Solutions—at a multiple of roughly 10 to 14 times that business's transaction EBITDA, implying a price of approximately $3.1 billion to $4.3 billion.

64. Bank of America itself analyzed several alternatives to a whole-company sale and concluded that they were worth materially more to D&B's stockholders than $9.15 per share. In a presentation to the Transaction Committee dated March 10, 2025—less than two weeks before the Board approved the Merger—Bank of America set out a menu of transaction structures and their implied per-share values, including:

a) a Reverse Morris Trust separating the Sales & Marketing Solutions segment and combining it with a strategic partner, which Bank of America valued at approximately $11.35 per share—roughly 24% above the Merger price;

b) a tax-free separation of the Finance & Risk and Sales & Marketing Solutions segments into standalone public companies (and a related reverse spin-off), which Bank of America valued in a range of $9.10 to $13.41 per share, with a midpoint of approximately $11.26—roughly 23% above the Merger price; and

c) a "RemainCo" retaining the Finance & Risk business following a sale of the Master Data Management business, which Bank of America—in its final fairness presentation dated March 23, 2025—valued at $9.14 to $11.42 per share, with a midpoint of approximately $10.28, more than a dollar above the deal price.

65. Each of these alternatives would have delivered more value to D&B's public stockholders than the whole-Company sale to Clearlake, but each lacked the single feature that made the Clearlake deal attractive to Foley: an immediate, all-cash payout that placed liquidity directly in Cannae's hands to appease its activist stockholders. A segment separation or partial sale would not have produced the quick cash Foley needed to satisfy Cannae's investors and repel Carronade, and so—notwithstanding their superior value to D&B's stockholders—these alternatives were cast aside.

66. None of this Bank of America analysis reflecting superior transaction alternatives reached D&B's public stockholders. As set out below, the Proxy instead disclosed only a single, value-diminishing alternative—an international spin-off that Bank of America valued at $6.55 to $9.06 per share, below the deal price—while omitting *every* alternative that Bank of America had valued above $9.15.

## V. THE LAST-MINUTE CUTS TO THE COMPANY PROJECTIONS

67. Bank of America's fairness opinion—the analytical foundation for the Board's approval of a $9.15 per share Merger price—rested on the Company's financial projections. Until the final days of Merger negotiations, those projections described a materially more optimistic future than the deal price implied.

68. Through late 2024 and early 2025, the Company's operative projections consisted of a long-range forecast prepared in September 2024, covering fiscal years 2025 through 2029, updated only as to fiscal year 2025 by a January 2025 "baseline" that reflected full-year 2024 results. Management left the out-year forecasts for 2026 through 2029 untouched throughout the negotiations—a period in which it continued to voice public confidence in the Company's trajectory. The undisturbed 2026-2029 projections reflected D&B management's own view that those targets remained achievable.

69. That changed at the eleventh hour. On or about March 19–20, 2025, management hastily assembled a new set of projections that reduced the Company's forecasts across the board. This was done during the same two-day window in which Carronade went public, Cannae pledged to return capital to its stockholders, and the Transaction Committee granted Clearlake exclusivity to negotiate its $9.00 per share proposal.

70. The reductions grew larger in each successive year and were substantial in the aggregate, as the following comparison reflects:

| **($ in millions)** | **2025** | **2026** | **2027** | **2028** | **2029** | **Total** |
|---|---|---|---|---|---|---|
| **Revenue — Prior** | 2,464 | 2,729 | 2,911 | 3,116 | 3,344 | 14,564 |
| **Revenue — Final** | 2,476 | 2,580 | 2,704 | 2,845 | 3,001 | 13,606 |
| **Revenue — Change** | 12 | (149) | (207) | (271) | (343) | (958) |
| **Adj. EBITDA — Prior** | 970 | 1,102 | 1,203 | 1,318 | 1,448 | 6,041 |
| **Adj. EBITDA — Final** | 970 | 1,021 | 1,083 | 1,157 | 1,243 | 5,474 |
| **Adj. EBITDA — Change** | 0 | (81) | (120) | (161) | (205) | (567) |

*Cumulatively, the revisions cut projected 2025–2029 revenue by approximately $958 million and projected adjusted EBITDA by approximately $567 million.*

71. The timing was no accident. These downward revisions surfaced precisely when Defendants needed lower numbers to make $9.15 per share defensible, and they were finalized without the deliberation such a change would ordinarily demand. Metadata for the file containing the revised projections shows it was last modified at 8:49 p.m. on March 19, 2025—before any Board vote and with no intervening Board meeting.

72. The Board never reviewed or approved the reduced financial projections—contrary to what the Proxy would later represent. No Board meeting took place between March 19, when the cuts were made, and March 23, when the Board approved the Merger. The materials circulated to directors ahead of the March 23 meeting contained no projections; the agenda referenced none; and the minutes of that meeting—which lasted roughly forty-five minutes yet purportedly covered some ninety pages of material—do not mention the projections at all, much less record their approval. By contrast, when the Board approved the Company's 2025 financial plan only weeks earlier, the minutes documented that approval expressly.

73. To conceal the contemporaneous slashing of the projections with the approval of the Merger, the Proxy misleadingly referred to the revised projections as the "March Projections," thereby concealing the exact date of the revision, a mere four days before approval of the Merger by the Board.

74. The inference is difficult to avoid: management, led by Defendant Jabbour, who also sat on the Transaction Committee along with the Chief Financial Officer Bryan Hipsher, engineered a more pessimistic forecast in the closing days of the sales process to prop up a price Foley had already resolved to accept. The Board approved the Merger without meaningfully testing the very numbers on which the Merger fairness opinion depended.

## VI. TERMS OF THE MERGER

75. Four days after the downward adjustment of the projections, on March 23, 2025, D&B entered into an Agreement and Plan of Merger with affiliates of Clearlake providing for the acquisition of D&B for $9.15 per share in cash and the Company's return to private ownership. Clearlake conditioned its final $9.15 offer on the Company's agreement not to pay its ordinary quarterly dividend before closing—a further concession wrung from D&B's stockholders at the finish line.

76. Concurrently with the Merger Agreement, Clearlake locked up voting commitments from D&B's two largest legacy holders. Cannae entered into a Voting and Support Agreement obligating it to vote its shares in favor of the Merger (the "Cannae Voting Agreement"), and THL entered into a substantially similar agreement covering its shares (the "THL Voting Agreement").

77. The two agreements differed in one revealing respect. Whereas the THL agreement barred THL from transferring its shares, the Cannae agreement carved out Cannae's right to sell up to ten million of its D&B shares at any time before closing. That carve-out advanced Foley's overriding objective—liquidity for Cannae—by allowing his investment vehicle to begin converting its D&B position to cash even before the Merger closed. Cannae promptly exercised it, selling approximately nine million shares and publicly emphasizing its ability to sell the remainder, while Foley took public credit for the sale as a capital-return achievement for Cannae.

78. D&B's public stockholders voted to approve the Merger on June 12, 2025, in reliance on the Proxy representations described below, and the Merger closed on August 26, 2025. Members of the Class, however, had already sold their shares during the Class Period at the artificially deflated prices established by the pending Merger—a price of $9.15 per share, well below the value of the alternatives Bank of America had identified yet the Proxy omitted.

## VII. THE FALSE AND MISLEADING PROXY

79. On May 13, 2025, the Company disseminated the Proxy to solicit stockholder approval of the Merger. The Proxy directed stockholders to rely exclusively on its contents, instructing them to "**RELY ONLY ON THE INFORMATION CONTAINED OR INCORPORATED BY REFERENCE IN THIS PROXY STATEMENT**," and stating that the Company had "**NOT AUTHORIZED ANYONE TO PROVIDE YOU WITH INFORMATION THAT IS DIFFERENT FROM WHAT IS CONTAINED IN THIS PROXY STATEMENT**." The Board, including each Individual Defendant, reviewed and approved the Proxy and certified that it knew of no matters to be presented at the special meeting of stockholders other than those the Proxy described. Having instructed stockholders to rely on the Proxy alone, Defendants were obligated to ensure that it was accurate and complete. It was neither.

80. The Proxy contained materially false and misleading statements, and omitted material facts necessary to make its statements not misleading, in at least the following respects.

### A. Misrepresentation/Omission 1: Concealed Genesis of the Sale

81. The Proxy attributed the Merger to an ordinary-course review process and organic third-party interest. It represented that the Board "regularly reviews and assesses" the Company's "strategic direction, financial performance and business plans," and it described the sale as having emerged from "periodic inbound inquiries" and an "informal market check" undertaken "[a]s part of" that routine review. The Proxy's enumerated reasons for the Merger likewise identified no external pressure driving the sale.

82. These statements were materially misleading because they concealed the actual impetus for the sale: the liquidity crisis and activist threat confronting Cannae, and Foley's resulting determination to convert D&B—Cannae's largest holding—into cash quickly in order to

address these issues. The Proxy did not disclose that Cannae traded at a steep discount to its net asset value; that Saba and Carronade had accumulated positions in Cannae and that Carronade had launched a proxy contest for Cannae's board. Nor did the Proxy's representations about the origins of the Merger disclose that Foley, upon returning as Cannae's Chief Executive Officer, had adopted a strategy of liquidating Cannae's public holdings—D&B foremost among them—to return capital to Cannae's stockholders.

83. The Proxy also failed to disclose the conduct that revealed this true genesis of the Merger. Such undisclosed conduct included a private meeting in November 2024 between D&B's Chief Executive Officer, Defendant Jabbour, and Clearlake's cofounder immediately after the activist investors at Saba and Carronade disclosed their positions in Cannae. A reasonable stockholder assessing whether $9.15 per share represented fair value would have considered it important to know that the Merger was actually driven by the liquidity needs of the Company's conflicted Executive Chairman rather than by the interests of D&B's public stockholders. By portraying the Merger as the product of a disinterested, ordinary-course process, the Proxy created a materially false impression for stockholders.

**B. Misrepresentation/Omission 2: Omitted Superior Valuations**

84. In support of the purported fairness of the $9.15 Merger price, the Proxy summarized Bank of America's financial analyses, including—among the "other factors" Bank of America considered—the implied value of a single strategic alternative: the spin-off of D&B's International Segment, which the Proxy stated carried an implied value of $6.55 to $9.06 per share. Specifically, the Proxy stated that "[i]n rendering its [fairness] opinion, BofA Securities" reviewed and considered:

> an illustrative analysis of the implied value of the [D&B common stock] and the common stock of a newly formed entity ("Spinco") after the separation of the Company's International segment from its remaining

> businesses, the contribution of the International segment to Spinco and a tax-free issuance of the International segment's common stock to the Company's stockholders, taking into account one-time and incremental costs, which indicated a total implied per share equity value range of $6.55 to $9.06 for the Company.

85. Because that lone disclosed alternative was worth no more than the deal price, its disclosure conveyed the impression that a whole-company sale at $9.15 per share was the most valuable outcome reasonably available to the Company's stockholders.

86. That impression was false, and the disclosure was materially misleading by omission. As Bank of America had advised the Transaction Committee only days before signing, several alternatives to a whole-company sale were worth materially more than $9.15 per share. This included (i) a Reverse Morris Trust valued at approximately $11.35 per share, (ii) a tax-free separation of the Company's Finance & Risk and Sales & Marketing Solutions segments valued at a midpoint of approximately $11.26 per share, and (iii) a Finance & Risk "RemainCo" following a sale of the Master Data Management business valued at a midpoint of approximately $10.28 per share. The Proxy disclosed none of these higher valuations presented to the Transaction Committee by Bank of America. Having elected to disclose one alternative from Bank of America's analysis, Defendants were obligated to disclose the others necessary to avoid a misleading picture of Merger fairness. By presenting only the alternative that made the Merger appear attractive, the Proxy materially misrepresented the range of value reasonably available to D&B's stockholders.

**C. Misrepresentation/Omission 3: False Board Approval of Projections**

87. The Proxy represented that the financial projections underlying Bank of America's fairness opinion—the "March Projections"—"were made available to the Board in connection with its evaluation of the proposed Merger and the other alternatives it considered, and were approved

by the Board to be used by BofA Securities in connection with the rendering of its opinion to the Board."

88. That representation was false. The Board neither reviewed nor approved the March Projections. Management finalized the reduced projections on the evening of March 19, 2025; no Board meeting took place between the March 19 cuts and the Board's March 23 approval of the Merger; the materials and agenda for the March 23 meeting neither included nor referenced any projections; and the minutes of that meeting—which lasted approximately forty-five minutes—reflect no review or approval of the projections. The Company's own books and records thus directly contradict the Proxy's representation about the March Projections.

89. The Proxy compounded the misrepresentation by obscuring the timing of the cuts. It stated only that the projections were prepared "in March 2025," omitting that management reduced them on March 19—nearly the same day the Transaction Committee granted Clearlake exclusivity and Carronade published its attack on Cannae, and just four days before the Board approved the Merger. These facts were material. The projections were the foundation of the fairness opinion, and a reasonable stockholder would have wanted to know both that the Board had not vetted them and that they had been cut, at the eleventh hour, in a manner that made the discounted Merger price appear fair to public stockholders.

**D. Misrepresentation/Omission 4: Advisor Conflicts in the Sales Process**

90. The Proxy also failed to disclose the full extent of the conflicts afflicting the Company's financial and legal advisors, whose ostensible independence lent credibility to the process and the price. Although the Proxy acknowledged in passing that Bank of America's lead banker, Cary Thompson, was "a current or former director of certain other companies affiliated" with Defendant Foley, it omitted the depth of the relationship—*i.e.*, that Thompson was a "longtime friend" of Foley who maintained social relationships with other members of the Board,

that he and Foley had served together on the Fidelity National Financial board for roughly two decades, and that Bank of America had begun work on the sale within days of Foley's return to Cannae under an engagement letter backdated to February 2024.

91. The Proxy's disclosure of Bank of America's fees was likewise misleadingly incomplete. It reported aggregate revenues from Clearlake over a two-year period, as follows:

> From March 1, 2023 through February 28, 2025, BofA Securities and its affiliates derived aggregate revenues from Clearlake and certain of its affiliates and portfolio companies of approximately $60 million for investment and corporate banking services.

This omitted the material fact that a large portion of the Clearlake fees—at least $35 million—was earned during the very months in which the Merger was negotiated, thereby obscuring that Bank of America was being paid substantial sums by both sides of the transaction even as it opined on the deal's fairness for the Company and its stockholders.

92. The Proxy also described Weil merely as "outside legal counsel to the Company," without disclosing that Weil and its lead partner had long served as principal outside counsel to Foley and his numerous affiliated entities.

93. These omissions were material because the independence and objectivity of the Company's legal and financial advisors bore directly on the reliability of the process that produced the $9.15 Merger price and the fairness opinion offered to support it.

## VIII. SCIENTER ALLEGATIONS

94. The Individual Defendants—and, through them, the Company—acted with scienter. Each knew, or recklessly disregarded, that the Proxy was materially false and misleading when it was disseminated. The facts that contradicted the Proxy were not obscure: they were recorded in the Company's own board materials, its financial advisor's presentations, and its

internal files, and were known to the very persons who prepared, reviewed, approved and certified the Proxy.

95. **Knowledge of the omitted valuations.** Bank of America presented the superior, non-whole-company alternatives—*i.e.*, the Reverse Morris Trust, the tax-free separation, and the Finance & Risk "RemainCo"—directly to the Transaction Committee on March 10, 2025, and conveyed the RemainCo valuation again in its final fairness presentation to the Committee on March 23, 2025, the day the Board approved the Merger. Defendants Foley, Jabbour, and Hagerty served on the Transaction Committee and received those presentations, and the full Board, including Ammerman, approved the Merger at the March 23 meeting during which Bank of America's fairness presentation was delivered. The Individual Defendants therefore knew that Bank of America had valued several Merger alternatives well above $9.15 per share at the very moment they approved a Proxy that disclosed only a single alternative worth less than the deal price.

96. **Knowledge that the Board had not approved the lower March Projections.** The Individual Defendants knew the Proxy's statement that the Board "approved" the March Projections was false because they were on the Board. As Board members, they knew whether they had reviewed and approved those projections. The Company's records—reflecting no projections in the March 23 Board materials, agenda, or minutes, and no Board meeting at all between the March 19 cuts and the March 23 vote—confirm that they had not. Defendant Jabbour, the Chief Executive Officer and member of the Transaction Committee who signed the Proxy, also oversaw management's preparation of the projections and knew they had been assembled on March 19–20, 2025, and never vetted or approved by the Board.

97. **Deliberate manipulation.** The abrupt, across-the-board reduction of the Company's financial projections on the eve of approval—concentrated in the out-years, unsupported by any documented business justification, and timed to the same day the Transaction Committee granted Clearlake exclusivity and Carronade attacked Cannae—supports a strong inference that the cuts were engineered to justify a lower price that Defendants had already resolved to accept, rather than being the product of a good-faith reforecast.

98. **Motive and concrete personal benefit.** Defendant Foley had a direct, concrete, and personal interest in causing D&B to be sold quickly for cash without regard to achieving the highest price for public shareholders. His investment vehicle, Cannae, was in a liquidity crisis—trading at a steep discount to net asset value and facing an activist proxy contest that threatened his control. A rapid, all-cash sale of Cannae's largest asset was his means of generating cash to return to Cannae's stockholders and to defeat Carronade before Cannae's 2025 annual meeting. Foley and Cannae publicly claimed credit for the D&B sale as a capital-return achievement, confirming that the transaction served their interests, and Cannae secured the right to sell up to ten million of its D&B shares before closing so that it could begin extracting cash immediately. The remaining Individual Defendants, by virtue of their longstanding financial and professional ties to Foley, were aligned with and beholden to those interests.

99. **Access, responsibility, and the significance of the transaction.** Each Individual Defendant reviewed and approved the Proxy, and the Board certified that it knew of no undisclosed matters. The Merger was the most consequential corporate event in the Company's recent history—the sale of the entire Company—and the Individual Defendants, as directors and, in Jabbour's case, as the Chief Executive Officer who signed the Proxy, were personally involved in the process and had access to the Board materials, banker presentations, and records that

contradicted the Proxy. Their approval and dissemination of a Proxy that misstated and omitted these core facts was, at a minimum, an extreme departure from the standards of ordinary care.

100. Taken collectively, these facts give rise to a strong inference that the Individual Defendants acted knowingly or with severe recklessness. Such inference is far more compelling than any innocent explanation for disseminating a Proxy that omitted higher Company valuations by D&B's own financial advisor and falsely represented that the Board had approved lower financial projections it never saw.

## IX. LOSS CAUSATION AND ECONOMIC LOSS

101. Defendants' misrepresentations and omissions were a direct and proximate cause of the losses suffered by Plaintiffs and the Class. By concealing D&B's true value—as evidenced by the alternatives Bank of America had valued well above $9.15 per share, as well as the Company's un-cut financial projections—and by falsely portraying a disinterested process and a Board-vetted fairness analysis, the Proxy caused D&B common stock to trade, and the Merger to be priced, at an artificially deflated level of $9.15 per share that did not reflect the Company's actual worth.

102. Absent the wrongdoing, the result would have been materially different and more favorable to D&B's public stockholders. Had the Proxy disclosed Bank of America's superior valuations, Defendant Foley's true motivation for the sale, and the truth about the projections, D&B's stockholders would have understood that the Company was worth substantially more than $9.15 per share. This fact was reflected in Bank of America's own alternative valuations of approximately $10.28 to $11.35 per share and in the approximately $12.13 analyst consensus price target that prevailed before the deal was struck. Informed of those facts, the members of the Class would not have sold their shares at the deflated prices they received; they instead would have

retained their shares to pursue a higher-value transaction, to vote against the Merger, or to exercise their appraisal or litigation rights to obtain fair value for their shares.

103. The artificial deflation of D&B's stock price is neither speculative nor incidental. It was the foreseeable—indeed, intended—consequence of a disclosure crafted to make a discounted, fire-sale price appear fair. The difference between the $9.15 per share the Class received and the Company's true value, as established by the Company's own financial advisor and by the market's pre-deal consensus, is the measure of the Class's economic loss.

104. Members of the Class sold their D&B shares on the open market during the Class Period, and/or exchanged their shares in the Merger, in reliance on the integrity of the market price and on the materially misleading Proxy, and sustained economic loss when they sold at prices artificially depressed by Defendants' misconduct. That loss was proximately caused by the concealment alleged herein, and not by any intervening market, industry, or Company-specific factor unrelated to Defendants' wrongdoing. Class members who were entitled to vote on the Merger were also denied the opportunity to make an appropriately informed decision on whether to vote in favor of the Merger.

## CLASS ACTION ALLEGATIONS

105. Plaintiffs brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities that (1) sold shares of D&B common stock in the open market during the period from May 13, 2025 through August 26, 2025, inclusive (the "Class Period"); (2) exchanged shares of D&B common stock into the Merger; and/or (3) held shares of D&B common stock as of the May 9, 2025 Record Date for the special meeting of stockholders and whose shares were voted on, or entitled to vote on, the Merger (subject to the following exclusions, the "Class").

106. Excluded from the Class are Defendants; the officers and directors of D&B and Cannae during the Class Period; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any Defendant has or had a controlling interest.

107. The members of the Class are so numerous that joinder of all members is impracticable. D&B common stock was actively traded on the NYSE, with 446,410,772 shares outstanding, as of May 9, 2025, held by thousands of beneficial holders of record geographically dispersed throughout the United States. The precise number of members can be ascertained from D&B's stockholder records, transfer-agent records, and the records of the Depository Trust Company and brokerage firms.

108. Common questions of law and fact exist as to all members and predominate over any questions affecting only individual members. These common questions include, among others:

a. whether Defendants violated Sections 10(b), 14(a) and/or 20(a) of the Exchange Act and Rules 10b-5 and 14a-9;

b. whether the Proxy contained material misrepresentations or omitted material facts necessary to make the statements therein not misleading;

c. whether Defendants acted with scienter with respect to the Section 10(b) claim, and negligently or otherwise with respect to the Section 14(a) claim;

d. whether the misrepresentations and omissions caused D&B common stock to trade, and the Merger to be priced, at artificially deflated levels;

e. whether the Proxy was an essential link in the accomplishment of the Merger; and

f. whether, and to what extent, the Class members sustained damages, and the proper measure of damages.

109. Plaintiffs' claims are typical of the claims of the other Class members, as all Class members were similarly affected by the same materially false and misleading Proxy and the same course of conduct by Defendants.

110. Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in securities class-action litigation. Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

111. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by individual members may be relatively small, the expense and burden of individual litigation make it impracticable for Class members to seek redress individually. There will be no unusual difficulty in the management of this action as a class action.

112. Plaintiffs and the Class are entitled to a presumption of reliance under the fraud-on-the-market doctrine because, at all relevant times, the market for D&B common stock was open, developed, and efficient: the stock was listed and actively traded on the NYSE; it traded at high weekly volumes; the Company was covered by numerous securities analysts; it was eligible to file, and did file, reports on SEC Forms 10-K and 10-Q; and market-makers reacted to public information concerning the Company. As a result, the market promptly digested public information, including the misstatements and omissions alleged herein, and reflected such information in the price of D&B common stock.

113. To the extent the claims are predicated on Defendants' omissions of material fact, Plaintiffs and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, because the omitted facts were material and Defendants had a duty to disclose them.

**COUNT I**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
***(Against D&B and the Individual Defendants — on behalf of the Class)***

114. Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

115. During the Class Period, D&B and the Individual Defendants disseminated or approved the Proxy, which they knew or recklessly disregarded was materially false and misleading in that it contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

116. D&B and the Individual Defendants each had ultimate authority over, and "made" the misstatements in the Proxy, and acted with scienter in that they knew, or recklessly disregarded, that the Proxy contained the material misstatements and omissions alleged herein. The Company's non-public books and records—including Bank of America's March 10 and March 23, 2025 presentations valuing the omitted alternatives, and the metadata reflecting the March 19, 2025 revision of the financial projections—establish that Defendants possessed the facts that contradicted the Proxy when they disseminated it. Defendants' acute, personal financial motive to consummate a rapid sale further supports a strong inference of scienter.

117. Defendants' misrepresentations and omissions were made in connection with the sale of D&B common stock by members of the Class. Plaintiffs and the Class sold their shares in reliance on the integrity of the market price and on the materially misleading Proxy, and at prices that were artificially deflated by Defendants' misconduct.

118. Defendants' material misrepresentations and omissions concealed the Company's true value, caused D&B common stock to trade—and the Merger to be priced—at artificially deflated levels, and directly caused the losses suffered by Plaintiffs and the Class, who sold their

shares at prices that did not reflect the Company's true value and forfeited their appraisal and litigation rights. The economic loss was a foreseeable consequence of, and was proximately caused by, the concealment alleged herein.

119. The statutory and judicial safe harbors for forward-looking statements do not apply to the misrepresentations alleged herein. The false statement that the Board approved the March Projections is a statement of present or historical fact; the statements were made in connection with a going-private transaction; the statements were not identified as forward-looking or accompanied by meaningful cautionary language; and Defendants knew the statements were false or misleading when made.

120. By reason of the foregoing, D&B and the Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, and are liable to Plaintiffs and the Class.

**COUNT II**
**Violations of Section 14(a) of the Exchange Act and Rule 14a-9**
***(Against D&B and the Individual Defendants — on behalf of Class members who held shares of D&B common stock as of the May 9, 2025 Record Date for the special meeting of stockholders and whose shares were voted on, or entitled to vote on, the Merger)***

121. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 93 and 101 through 113 as if fully set forth herein, except the allegations of scienter, which are not required to state a claim under Section 14(a).

122. The Proxy was a solicitation subject to Section 14(a) and Rule 14a-9. In the Proxy, D&B and the Individual Defendants, that solicited stockholder approval of the Merger, made statements that were materially false and misleading, and omitted material facts necessary to make the statements therein not false or misleading, as alleged above.

123. D&B and the Individual Defendants were, at a minimum, negligent in preparing, reviewing, approving, and disseminating the Proxy. They had actual or constructive knowledge

of the omitted and misstated facts, which were within their control and set out in the Company's own books and records.

124. The Proxy was an essential link in the accomplishment of the Merger. The affirmative vote of the holders of a majority of D&B's outstanding common stock was required to approve the Merger, and the shares controlled by Cannae and other supporting stockholders were insufficient to approve it. The votes of the public stockholders that held shares of D&B common stock as of the May 9, 2025 Record Date were, therefore, necessary and were procured by means of the false and misleading Proxy.

125. By reason of the foregoing, D&B and the Individual Defendants violated Section 14(a) and Rule 14a-9 and are liable to the Class members that held shares of D&B common stock as of the May 9, 2025 Record Date for the special meeting of stockholders and whose shares were voted on, or entitled to vote on, the Merger.

**COUNT III**
**Violations of Section 20(a) of the Exchange Act in Relation to Violations of Section 10(b) of the Exchange Act**
***(Against Foley and Cannae — on behalf of the Class)***

126. Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 120 as if fully set forth herein.

127. Foley and Cannae were controlling persons of the primary violators of Section 10(b) within the meaning of Section 20(a) of the Exchange Act. Defendant Foley, as Executive Chairman of D&B and Chairman and CEO of Cannae, and Defendant Cannae, acting through its dual fiduciaries Foley and Ammerman and through its Voting and Support Agreement, possessed the power to direct, and did direct, the management, policies and conduct of the primary violators, including the preparation, approval, and dissemination of the Proxy.

128. Defendants Foley and Cannae were culpable participants in the violations alleged in Count I. By reason of their control, Foley and Cannae are jointly and severally liable with the primary violators to the same extent.

129. By reason of the foregoing, Defendants Foley and Cannae are liable to Plaintiffs and the Class.

**COUNT IV**

**Violations of Section 20(a) of the Exchange Act in Relation to Violations of Section 14(a) of the Exchange Act**

***(Against Foley and Cannae — on behalf of Class members who held shares of D&B common stock as of the May 9, 2025 Record Date for the special meeting of stockholders and whose shares were voted on, or entitled to vote on, the Merger)***

130. Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 93, 101 through 113, and 122 through 125 as if fully set forth herein, except the allegations of scienter, which are not required to establish liability for this Count.

131. Foley and Cannae were controlling persons of the primary violators of Section 14(a) within the meaning of Section 20(a) of the Exchange Act. Defendant Foley, as Executive Chairman of D&B and Chairman and CEO of Cannae, and Defendant Cannae, acting through its dual fiduciaries Foley and Ammerman and through its Voting and Support Agreement, possessed the power to direct, and did direct, the management, policies, and conduct of the primary violators, including the preparation, approval, and dissemination of the Proxy.

132. Defendants Foley and Cannae were culpable participants in the violations alleged in Count II. By reason of their control, Foley and Cannae are jointly and severally liable with the primary violators to the same extent.

133. By reason of the foregoing, Defendants Foley and Cannae are liable to Plaintiff FNY Partners Fund LP, and other Class members that held shares of D&B common stock as of

the May 9, 2025 Record Date for the special meeting of stockholders and whose shares were voted on, or entitled to vote on, the Merger.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A. Determining that this action is a proper class action; certifying the Class under Rule 23 of the Federal Rules of Civil Procedure; appointing Plaintiffs as class representatives; and appointing Plaintiffs' counsel as class counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with prejudgment and post-judgment interest thereon;

C. In the alternative, awarding rescissory damages to the Class members that held shares of D&B common stock as of the May 9, 2025 Record Date for the special meeting of stockholders and whose shares were voted on, or entitled to vote on, the Merger;

D. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

E. Awarding such equitable, injunctive or other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: September 10, 2026

Respectfully submitted,

**KOZYAK TROPIN & THROCKMORTON LLP**

By: /s/ *Brandon M. Sadowsky*
Jorge L. Piedra
Florida Bar No. 88315
Brandon M. Sadowsky
Florida Bar No. 1052643
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800
jpiedra@kttlaw.com
bsadowsky@kttlaw.com

*Attorneys for Plaintiffs FNY Partners Fund LP and FNY Managed Accounts, LLC*

**ENTWISTLE & CAPPUCCI LLP**
Vincent R. Cappucci (*pro hac vice forthcoming*)
Robert N. Cappucci (*pro hac vice forthcoming*)
Brendan J. Brodeur (*pro hac vice forthcoming*)
Jonathan H. Beemer (*pro hac vice forthcoming*)
230 Park Avenue, 3rd Floor
New York, New York 10169
Telephone: (212) 894-7200
Facsimile: (212) 894-7272
vcappucci@entwistle-law.com
rcappucci@entwistle-law.com
bbrodeur@entwistle-law.com
jbeemer@entwistle-law.com

*Attorneys for Plaintiffs FNY Partners Fund LP and FNY Managed Accounts, LLC*